**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOHN SULLIVAN RALPH, III, | ) | Case No. 23-20668-RDB |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| GLOCK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Complaint No. _____ |
| | ) | |
| JOHN SULLIVAN RALPH, III, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

Plaintiff, Glock, Inc., by and through its attorneys, brings this adversary proceeding against Defendant John Sulivan Ralph, III, to determine the dischargeability of certain debts pursuant to 11 U.S.C. §§ 523(a)(2), (4), (6), and (13).

1.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(I).

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4.     Plaintiff Glock, Inc. is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 6000 Highlands Parkway, Smyrna, GA 30082.

5.      Upon information and belief, Debtor John Sullivan Ralph, III ("Ralph") is currently a resident and citizen of the State of Kansas.

6.      On June 19, 2023 Ralph filed a voluntary petition for relief with this Court pursuant to Chapter 7 of the Bankruptcy Code, in which he listed Glock, Inc. as a creditor.

7.      On June 20, 2023, this Court entered a Notice of Chapter 7 Bankruptcy Case, which set September 25, 2023 as the deadline to file a complaint to determine dischargeability of certain debts.

8.      Glock, Inc. filed a Complaint against Global Guns & Hunting, Inc. d/b/a OMB Guns ("OMB Guns") on January 13, 2012 in the U.S. District Court for the Northern District of Georgia, Case No. 1:12-cv-0136 ("Glock, Inc. v. OMB Guns Case").

9.      Glock, Inc. filed an Amended Complaint in the Glock, Inc. v. OMB Guns Case on February 26, 2013, in which it added Ralph as an additional defendant.

10.     On August 18, 2016, the U.S. District Court for the Northern District of Georgia entered an Order (Doc. No. 198, attached hereto as Exhibit 1) entering default judgment in favor of Glock, Inc. against Ralph on four causes of action: (1) fraud; (2) cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d); (3) federal trademark counterfeiting and infringement in violation of the Lanham Act, 15 U.S.C. § 1114; and (4) violations of the Georgia Civil RICO Act, Ga. Code § 16-14-4.

11.     In the August 18, 2016 Order, the court made detailed findings that Glock, Inc. had properly established its claim against Ralph for fraud, which involved the submission of false purchase orders and bribes paid to certain of Glock, Inc.'s managers through shell companies set up by their spouses.   August 18, 2016 Order at 7-10.

2

12.     In the August 18, 2016 Order, the court made detailed findings that Glock, Inc. had properly established its claim against Ralph for cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d) by registering certain websites that used the term "Glock" without Glock, Inc.'s permission and with bad faith intent to profit from those marks.   August 18, 2016 Order at 10-11.

13.     In the August 18, 2016 Order, the court made detailed findings that Glock, Inc. had properly established its claim against Ralph for federal trademark counterfeiting and infringement in violation of the Lanham Act, 15 U.S.C. § 1114, by selling counterfeit merchandise bearing "Glock" logos to mislead consumers into believing that they were genuine Glock, Inc. products. August 18, 2016 Order at 11-12.

14.     In the August 18, 2016 Order, the court made detailed findings that Glock, Inc. had properly established its claim against Ralph for violation of the Georgia Civil RICO Act, Ga. Code § 16-14-4, by engaging in mail and wire fraud, and paying bribes to Glock, Inc. managers.   August 18, 2016 Order at 12-14.

15.     On August 8, 2017, a hearing was held to present evidence regarding the amount of damages to be awarded to Glock, Inc. pursuant to the August 18, 2016 default judgment.

16.     On September 25, 2017, the District Court issued an Amended Judgment and Findings of Fact and Conclusions of Law (Doc. No. 241, attached hereto as Exhibit 2), ordering that judgment be entered in favor of Glock, Inc. against Ralph in the amount of $5,422,311.63.

17.     Ralph was indicted by the United States in the U.S. District Court for the Northern District of Georgia in the case of United States v. Ralph, No. 5:14-cr-40066, and charged in a twenty-two count indictment (Doc. No. 1, attached hereto as Exhibit 3), with conspiracy, wire

3

fraud, and money laundering ("U.S. v. Ralph Case") arising from the same actions through which he had defrauded Glock, Inc. based on the allegations in the Glock, Inc. v. OMB Guns Case.

18.     Ralph pled guilty to the conspiracy count in the indictment and a Second Amended Judgment was entered against him on December 28, 2015 (Doc. No. 189, attached hereto as Exhibit 4), pursuant to which he was ordered to pay $883,098.23 in criminal restitution to Glock, Inc.

## COUNT I

## OBJECTION TO DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

19.     Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

20.     The $5,422,311.63 judgment entered in favor of Glock, Inc. in the OMB Guns case constitutes monies that Ralph obtained through false pretenses, a false representation, or actual fraud and therefore this debt is not dischargeable.

## COUNT II

## OBJECTION TO DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(4)

21.     Paragraphs 1 through 20 are incorporated by reference as if fully set forth herein.

22.     The $5,422,311.63 judgment entered in favor of Glock, Inc. in the OMB Guns case constitutes monies that Ralph obtained through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny and therefore this debt is not dischargeable.

## COUNT III

## OBJECTION TO DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)

23.     Paragraphs 1 through 22 are incorporated by reference as if fully set forth herein.

4

24.    The $5,422,311.63 judgment entered in favor of Glock, Inc. in the OMB Guns case constitutes monies that Ralph obtained through his willful and malicious injury to Glock, Inc. and therefore this debt is not dischargeable.

## COUNT IV

## OBJECTION TO DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(13)

25.    Paragraphs 1 through 24 are incorporated by reference as if fully set forth herein.

26.    The $883,098.23 in criminal restitution that Ralph was ordered to pay Glock, Inc. in the U.S. v. Ralph case constitutes an order of restitution issued under title 18, United States Code, and therefore this debt is not dischargeable.

WHEREFORE, Plaintiff Glock, Inc. respectfully requests that this Court issue a determination that the $5,422,311.63 judgment entered against Ralph in the Glock, Inc. v. OMB Guns Case is not subject to discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (4), and (6) and that the $883,098.23 in criminal restitution ordered in the U.S. v. Ralph case is not subject to discharge pursuant to 11 U.S.C. § 523(a)(13), and award it costs, reasonable attorney fees, and any other relief as the Court may deem just and proper.

Dated: September 25, 2023

                              */s/ George D. Halper*
                              George D. Halper (Kansas Bar # 14736)
                              ghalper@mvplaw.com
                              **McANANY, VAN CLEAVE & PHILLIPS**
                              10 East Cambridge Circle Drive, Suite 300
                              Kansas City, KS 66103
                              Telephone: (913) 371-3838
                              Facsimile: (913) 371-4722

                              and

5

Christopher Renzulli (*pro hac vice* to be filed)
crenzulli@renzullilaw.com
Scott C. Allan (*pro hac vice* to be filed)
sallan@renzullilaw.com
**RENZULLI LAW FIRM, LLP**
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
Facsimile: (914) 285-1213

Counsel for Plaintiff Glock, Inc.

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GLOCK, INC.                               :
                                          :
     Plaintiff,                          :
                                          :         CIVIL ACTION NO.
     v.                                  :         1:12-CV-136-AT
                                          :
GLOBAL GUNS & HUNTING, INC.               :
d/b/a OMB Guns, et al.,                   :
                                          :
     Defendants.                         :
                                          :
                                          :
                                          :

## ORDER

     This matter is before the Court on Plaintiff's Motion for Entry of Default Judgment Against Defendants on the Issue of Liability and to Schedule a Hearing to Determine the Damages to be Awarded [Doc. 197].  On June 22, 2015, Judge Shoob granted leave to withdraw to counsel for Defendants Global Guns & Hunting, Inc., d/b/a OMB Guns ("OMB") and John Ralph III ("Ralph").  Judge Shoob then directed OMB to obtain counsel within twenty-one (21) days of its June 22, 2015 Order, and further directed Defendant Ralph to inform the Court of whether he wanted to appear *pro se* and provide his current contact information.  The Order specified that failure to comply with its provisions would constitute a default.

EXHIBIT
1

OMB never retained new counsel and Ralph never indicated his desire to appear *pro se* or provided new contact information to the Court. As a result, on July 15, 2015, Judge Shoob entered an Order directing the Clerk to enter Defendants' default, and directed the Clerk to reassign the matter to another judge for trial. (Order. Doc. 193.) Because OMB and Ralph were in default, Plaintiff Glock, Inc. then filed its Motion for Default Judgment. [Doc. 197.]

## I. Standard

The legal standard for granting a default judgment was recently set forth by the Eleventh Circuit in *Surtain v. Hamlin Terrace Foundation*:

> When a defendant has failed to plead or defend, a district court may enter judgment by default. Fed. R. Civ. P. 55(b)(2). Because of our "strong policy of determining cases on their merits," however, default judgments are generally disfavored. *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003). "[W]hile a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact, he is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (alteration omitted) (quotation marks omitted). Entry of default judgment is only warranted when there is "a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975).

> Although *Nishimatsu* did not elaborate as to what constitutes "a sufficient basis" for the judgment, we have subsequently interpreted the standard as being akin to that necessary to survive a motion to dismiss for failure to state a claim. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim. *See Wooten v. McDonald Transit Assocs., Inc.*, 775 F.3d 689, 695 (5th Cir. 2015)

(stating in the context of a motion for default judgment, "whether a factual allegation is well-pleaded arguably follows the familiar analysis used to evaluate motions to dismiss under Rule 12(b)(6)").

When evaluating a motion to dismiss, a court looks to see whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965).

S*urtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

The Court notes that the case is in a somewhat interesting procedural posture in that Glock has moved for default judgment – which applies something akin to a "reverse motion to dismiss" standard, *Surtain*, 789 F.3d at 1245, *after* Judge Shoob denied summary judgment for Glock on several of its claims due to lack of evidence. Glock's burden on the present motion is significantly lighter than its burden at summary judgment was. Now it merely needs to show that it properly alleged its claims and pled facts that, if true, support those claims. It does not need to present evidence as to liability. At summary judgment it had to provide actual evidence. This is the reason why the Court is granting default judgment for Glock on several claims that did not succeed at the summary judgment stage. Importantly, the fact that Glock did not prevail at summary judgment does not mean that its claims were not viable; it just means that Glock

3

failed to present sufficient evidence at the time, and, had Defendants not defaulted, would have had to prove its claims at trial.

## II. Discussion

Glock filed its Amended Complaint [Doc. 90] on February 26, 2013. Glock alleged that it had a business relationship selling firearms to Defendants for several years. but that during the course of this business relationship, Defendants had engaged in several schemes meant to defraud Glock.

First, Glock alleged Defendants had purchased discounted pistols from Glock meant for sale at reduced prices to law enforcement organizations, but instead sold the pistols in the commercial market at significantly higher prices. Glock next alleged that Defendants had sold sample pistols that should have been given to law enforcement agencies for testing and evaluation purposes, and sold thousands of dollars worth of promotional items that should have been given away for free to customers. The Complaint also alleged that Defendant OMB and its owner, Defendant Ralph, bribed two Glock executives named Woods and Dutton by making payments to these executives' wives so that the executives could help OMB facilitate and conceal its schemes. Finally, the Amended Complaint alleged that OMB and Ralph registered more than a dozen internet domain names using the trademarked "Glock" tag, and sold counterfeit merchandise bearing Glock's logo without Glock's permission.

Based on these facts, Glock's Amended Complaint advanced claims for breach of contract, unjust enrichment, conversion, theft by conversion, theft by deception, fraud, cybersquatting, federal trademark violations, and violations of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act.

Ralph filed a motion to dismiss or, in the alternative, a motion for a more definite statement (Doc. 119), alleging Glock had failed to state a claim and failed to plead its fraud and RICO claims with sufficient particularity.  (*See* Doc. 120.) Judge Shoob rejected those arguments as "without merit" in a brief Order (Doc. 129), adopting the reasons set forth in Plaintiff's Response to the Motion to Dismiss.  (Doc. 121.)

The parties then filed cross-motions for summary judgment.  Glock withdrew its claim for common law conversion, and Judge Shoob granted summary judgment in favor of Defendants and against Glock on Glock's claims for theft by conversion, theft by deception, and unjust enrichment.  (Order, Doc. 179 at 18, 37.)  The court also granted summary judgment in favor of Glock and against Defendants on Defendants' counterclaim for breach of contract found in Count II of its Answer and Counterclaim (Doc. 99).

The court next granted Glock summary judgment on its breach of contract claims under its theory that Defendants diverted pistols meant for sale to law enforcement agencies to the commercial market, sold sample pistols that were designated for testing, and sold promotional items, but denied summary

5

judgment in part regarding Glock's theory that Defendants breached agreements to sell specially priced law enforcement pistols at discounted rates to specific agencies.  The Court also denied summary judgment on the issue of damages for the other three theories based on lack of sufficient evidence.  (Order, Doc. 179 at 24 – 36.)

The court also denied summary judgment for Glock on its claims for fraud, cybersquatting, federal trademark counterfeiting and infringement, and violations of Georgia RICO.  (Order, Doc. 179 at 38, 41, 45, 50.)  In each instance, the Court found that Glock had failed to submit sufficient evidence to show that there was no genuine issue of material fact remaining for a jury to decide.

But the court did not dismiss or grant summary judgment in favor of Defendants on these claims.  The court's order denying Ralph's motion to dismiss (Order, Doc. 129) and order declining to grant summary judgment to Glock on a number of claims due to lack of sufficient evidence (Order, Doc. 179) both make plain one thing:  the court viewed Glock's Amended Complaint as properly stating its claims for breach of contract, fraud, cybersquatting, trademark violations, and Georgia RICO violations.  The Court sees no reason to upset these determinations.   Nonetheless, for the sake of completeness, the Court will provide a brief examination as to why each of these claims is properly stated in the Amended Complaint, and that default judgment in favor of Glock is therefore warranted.

6

### A. Fraud

The Court first finds that Glock has properly stated a claim for fraud against Defendants.

"In order to prove fraud [in Georgia], the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." *Summit Automotive Group, LLC v. Clark*, 681 S.E. 2d 681, 686 (Ga. Ct. App. 2009) (citation and punctuation omitted). Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires a Complaint "alleging fraud or mistake . . . [to] state with particularity the circumstances constituting fraud or mistake." In *American Dental Association v. Cigna Corporation*, 605 F.3d 1283, (11th Cir. 2010), the Eleventh Circuit reiterated that, "pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Id.* at 1291 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)) (internal quotation marks omitted). The Court has no doubt that Glock met its burden.

First, Glock described in detail the schemes by which Defendants defrauded Glock. Glock alleged that OMB entered into a series of agreements

promising it would sell certain pistols to law enforcement agencies, when in fact it was selling a substantial portion of the pistols on the commercial market.  Two Glock employees, Dutton and Woods, aided OMB in perpetrating, facilitating, and concealing these schemes.  (*E.g.*, Am. Compl. ¶ 113.)

OMB accomplished this scheme by submitting false purchase orders expressly indicating that the pistols OMB was buying were going to be sold to law enforcement agencies when in fact they were sold in the commercial market.  (*E.g.*, Am. Compl. ¶¶ 82 – 92.)  Importantly, Glock identifies specific fraudulent transactions that it claims were fraudulent.  For example, it alleges that "OMB submitted two (2) purchase orders to Glock, the first dated May 15, 2009 for the purchase of 100 Glock 23 [law enforcement] pistols, and the second dated July 13, 2009 for the purchase of, among other things, another 100 Glock 23 [law enforcement] pistols."  (*Id.* ¶ 91.)  However, OMB then "sold 152 of these 200 [law enforcement] pistols" to commercial buyers.  (*Id.*)  Glock includes similar allegations for the other fraudulent OMB schemes.  For example, it includes specific examples of the scheme where OMB requested discounted pricing for law enforcement pistols and made oral representations that the discounts were necessary to win orders from specific law enforcement agencies, but then sold the discounted prices to other persons and organizations.  (*E.g.*, *id.* ¶ 102 (alleging that OMB submitted a false purchase order on December 4, 2009 for 240 discounted pistols to purportedly sell to the North Carolina Wildlife Resources

Commission; in fact, OMB sold none of the pistols to that Commission and instead sold them to other buyers).)    And Glock provides specific allegations concerning the "Sales Sample" Scheme.  Specifically, it alleges that between 2007 and 2010, OMB obtained approximately 1,330 sales sample pistols that were to be "retained and used for [testing and evaluation] [p]urposes."  (Am. Compl. ¶¶ 103 – 107.)  OMB obtained these sample pistols through "false and misleading Sales Sample Requests" which were drafted to "create or confirm Glock's impression that OMB would retain and use" the sales samples for training and evaluations purposes.  (*Id.* ¶ 108.)    The Complaint also includes specific allegations about the "Promotional Items Scheme," where OMB obtained promotional items that were supposed to be given away without charge, but which were instead sold by OMB.  (*E.g.*, Am. Compl. ¶¶ 116 – 123.)

Finally, Glock adequately alleges Ralph's participation in the fraudulent scheme.  They allege that Ralph was the sole corporate officer of OMB during late 2007 through 2010 when the fraudulent scheme was taking place, and that he was president and sole stockholder during that time.  (Am. Compl. ¶¶ 71 - 78.) They allege that Ralph had "frequent and routine" sales contacts with Wood and Dutton, the Glock employees who facilitated the scheme from within Glock.  (*Id.* ¶ 79.)

The Amended Complaint also includes allegations that Defendant Ralph directed OMB to pay over $400,000 to Dutton's and Wood's spouses in order to

secure their cooperation to perpetrate the above-described schemes to defraud Glock. (Am. Compl. ¶¶ 124 – 128.) The Complaint alleges that these payments were made between 2003 and 2011, and includes several specific examples of the payments being made. For example, the Complaint alleges that Ralph made a direct deposit via wire transfer of $5,000.00 into the account of Supreme Solutions, LLC, a business that Dutton's spouse controlled and had created for the purpose of receiving these payoffs. (*Id.* ¶¶ 127, 135.) Finally, the Amended Complaint alleges that Ralph directed each of the schemes. (*E.g.*, Am. Compl. ¶¶ 111, 121.)

Accordingly, Glock has alleged the "who, what, when, where, why, and how" of the fraud. It has identified specific misrepresentations made by OMB in the form of fraudulent purchase orders. It has identified specific transactions made on specific dates that were allegedly fraudulent. It has identified who made the false representations – OMB – and who else was involved – Ralph, OMB employees, and Woods and Dutton. And it has pled intent and justifiable reliance. (Am. Compl. ¶¶ 227 – 229. ) Default judgment on this claim is therefore appropriate.

### B. Cybersquatting

Glock also claims that Defendants violated the Lanham Act, 15 U.S.C. § 1125(d), by registering a number of infringing domain names, including glockomb.com, glockgoods.com, policeglock.com, and bluelabelglock.com

without notifying Glock or obtaining its approval.  (Am. Compl. ¶¶ 157- 158.)  As Glock observes in its Motion, its allegation that OMB registered a number of websites using the Glock name without authority, that the Glock trademark was famous at the time of registration, and that "Defendants have acted with the bad faith intent to profit from the Glock Name . . . by registering the Infringing Domain Names" is sufficient to state a cybersquatting claim.  *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006) (granting default judgment on cybersquatting claim).  Default judgment is therefore appropriate.

## C.  Federal Trademark Counterfeiting and Infringement

Glock next argues that OMB manufactured, distributed, offered, and sold counterfeit Glock merchandise at Defendant' Ralph's direction.  (Am. Compl. ¶ 266.)

> "The Lanham Act imposes liability for trademark counterfeiting on any person who shall 'use in commerce . . . any counterfeit . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.  *Nike Inc. v. Variety Wholesalers, Inc.,* 274 F.Supp.2d 1352, 1367 (N.D.Ga.2003) (quoting 15 U.S.C. § 1114(1)(a)).  A counterfeit mark is defined as 'a spurious mark which is identical with, or substantially indistinguishable from, a registered mark. *Id.* (quoting 15 U.S.C. § 1127)."

*Bentley Motors Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1312 (M.D. Fla. 2013) (internal quotations omitted).  Here, Glock alleged that Defendants made or used copies or simulations of Glock logos on its counterfeit merchandise that caused confusion as to the origin of the counterfeit goods because the marks were

"intentionally identical" to the original Glock logo. (Am. Compl. ¶¶ 266 – 267.) This was all done without license or consent. (*Id.*) These allegations are sufficient to state a claim for trademark counterfeiting and infringement. *See Bentley Motors Corp*, 976 F. Supp. 2d at 1312. Accordingly, the Court **GRANTS** default judgment in favor of Glock and against Defendants on these claims.

### D. Georgia RICO

Finally, the Court finds Glock has adequately pled a Georgia RICO claim and is therefore entitled to default judgment against Defendants. In order to plead a Georgia RICO claim, a plaintiff must allege that (1) a defendant violated or conspired to violate the RICO statute by committing two or more predicate acts as defined by the statute; (2) that as the a result of this conduct the plaintiff suffered an injury; and (3) the RICO violation was the proximate cause of plaintiff's injury. *Wylie v. Denton*, 746 S.E.2d 689, 693 (Ga. Ct. App. 2013). To demonstrate proximate clause, the plaintiff must show that its injury flowed from at least one of the predicate acts committed by the defendant. *Id.* at 694. Predicate acts are the commission, solicitation, coercion, or attempt to commit one of forty categories of offenses under O.C.G.A. § 16-14-3(9)(A)(i)-(xli). For the purposes of this order, several potential predicate acts are relevant. First, selling counterfeit trademarked merchandise may constitute a predicate act under Georgia RICO. O.C.G.A. § 16-14-3(9)(A)(xxix) (2009 – 2010) 18 U.S.C. § 1961(1)(B) (2006). Second, engaging in "[r]acketeering activity" may qualify as a

predicate act under Georgia RICO.  Racketeering activity includes "any act or threat involving . . . bribery," O.C.G.A. § 16-4-3(9)(B) (2009 – 2010), and the commission of mail fraud or wire fraud.  *Id.*; 18 U.S.C. § 1961(B) (2006).

Here, Glock alleges that, *inter alia*, Defendants committed mail and wire fraud by mailing checks or wiring money to the spouses of Dutton and Woods and organizations they controlled for the purposes of making and concealing payments meant to facilitate the ongoing scheme to defraud Glock.  (Am. Compl. ¶¶ 294 – 297.)  Glock identifies two occasions on which Ralph and OMB paid the spouses of Glock employees in furtherance of the scheme.  (*See* Am. Compl. ¶ 256 (incorporating earlier allegations in paragraphs 127, 128).)  Specifically, Glock alleges that Wood's spouse received a check in the amount of $1,049 on February 18, 2006, and Dutton's spouse's LLC received a check in the amount of $5,000 on September 15, 2009.  (Am. Compl. ¶¶ 134 – 135.)  Glock also alleges that Defendants sold and conspired to sell counterfeit trademarked merchandise. (Am. Compl. ¶ 300.)

Glock further plausibly alleges that the aforementioned activities – including OMB's fraudulent schemes, and its use of mail and wire fraud and bribery to perpetrate and advance those schemes – were part of an overarching and interrelated plan meant to allow OMB to obtain and sell Glock merchandise in a variety of fraudulent manners.  Glock alleges it has suffered financial harm because its trademarks have been wrongfully appropriated, because it sold

13

firearms at a discount based on false representations made by Defendants, and because it sold or gave away promotional merchandise or training firearms to Defendants, only to have Defendants wrongfully resell that merchandise at an illicit profit. This plan plainly targeted Glock. (Am. Compl. ¶ 313.) Accordingly, Glock has plausibly alleged Defendants committed violations of Georgia RICO, and is entitled to a default judgment against Defendants.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** Glock's Motion for Default Judgment against Defendants, and further **GRANTS** Glock's Motion for a Hearing to Determine Damages to be Awarded. [Doc. 197.] The Court further **DISMISSES** OMB's remaining Counterclaims for failure to obtain appropriate representation. OMB cannot prosecute these counterclaims without an attorney. *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1386 (11th Cir. 1985) (affirming trial court's dismissal of corporation's claims for failure to obtain representation).

Glock is **DIRECTED** to contact the Court's Deputy Courtroom Clerk, Ms. McConochie, to schedule a hearing on damages, and is further **DIRECTED** to serve notice of such hearing upon Defendant OMB and Defendant Ralph.[1]

It is so **ORDERED** this 18th day of August, 2016.

AMY TOTENBERG
UNITED STATES DISTRICT JUDGE

---

[1] To the best of the Court's current knowledge, Defendant Ralph is presently incarcerated, and should be served at his place of incarceration.

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **GLOCK, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:12–CV–0136-AT** |
| **v.** | ) | |
| | ) | |
| **GLOBAL GUNS & HUNTING,** | ) | |
| **INC. d/b/a OMB GUNS and** | ) | |
| **JOHN RALPH, III,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## AMENDED[1] JUDGMENT AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's August 18, 2016 Order (Doc. No. 198), default judgment was entered in favor of Glock against defendant Global Guns & Hunting, Inc. d/b/a OMB Guns ("OMB") on five causes of action: (1) breach of contract; (2) fraud; (3) cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d); (4) federal trademark counterfeiting and infringement in violation of the Lanham Act, 15 U.S.C. § 1114; and (5) violations of the Georgia Civil RICO Act, Ga. Code § 16-14-4. Default judgment was entered in favor of Glock against

---

[1] Glock contacted the Court shortly after the Court entered judgment to raise two issues: (1) the Court had awarded in the text of the Judgment and Findings of Fact and Conclusions of Law $121,276.08 in fees incurred by Glock in connection with its investigation of two of its employees who were allegedly taking bribes from OMB prior to filing the Complaint, but had not awarded those fees as part of the final judgment; and (2) Glock had included expenses in its request for attorney's fees, meaning that the Court applied its 20% reduction to both Glock's fees and its expenses. This Judgment corrects those errors.

EXHIBIT 2

John Ralph, III ("Ralph") on all of those same causes of action, except for breach of contract. The default judgment resulted in the factual allegations in the Second Amended Complaint regarding defendants' liability for the above cause of action being deemed established. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015); *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1106 (11th Cir. 2015); *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987); *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[2]

A hearing to present evidence regarding the amount of damages to be awarded to Glock pursuant to the above causes of action was held beginning on August 8, 2017. The Court heard testimony and received evidence. The Court ensured that Defendant Ralph had notice of the hearing and the opportunity to attend. Ralph, who does not live in Georgia, informed the Court that he would not attend, though the Court offered to explore the possibility of teleconferencing him in.[3]

_____

[2] The Court notes that Judge Shoob's March 30, 2015 Order granting in part and denying in part Glock's motion for summary judgment raised a number of issues concerning Glock's entitlement to a liability ruling and to damages. The Court explored those issues in determining whether or not to grant Glock's motion for default judgment and at the hearing on damages. But because of the relevant legal standards for default judgment, the Court found it appropriate to grant default judgment and now finds it legally and factually appropriate to award significant damages to Glock.

[3] Ralph filed a Motion to Waive Appearance at Hearing, which the Court granted thought it was unneeded. In that motion, Ralph explained he lacked the funds to travel to Atlanta, was "metaphorically bankrupt," and that he wished to waive his right to appear. (Doc. 228 at 1-2.)

Based on the testimony and documentary evidence received during the damages hearing, the Court makes the following findings of fact and conclusions of law.

1.      Glock is a federally licensed manufacturer and importer of pistols.

2.      OMB was a federally licensed independent distributor of firearms at all times relevant to this action.

3.      Ralph was the President and controlling shareholder of OMB at all times relevant to this action.

4.      Glock has created two different sales channels for purposes of licensing its independent distributors.

5.      One channel is for sales to the law enforcement market ("LE Market"), which includes federal, state and local law enforcement agencies across the United States.

6.      The other channel is the "Commercial Market" for most other sales.

7.      Federal law requires each pistol manufactured or imported to be marked with a unique serial number. 18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(1)(i). Anyone engaged in the business of manufacturing, importing, or purchasing and reselling firearms is required to have a federal firearms license.  18 U.S.C. §§ 922(a)(1)(A); 923(a); 27 C.F.R. § 478.41(a).  Every federal firearms licensee is required to keep acquisition

and disposition records with information on every firearm it acquires, whether by manufacturing, importing or purchasing it, and information on from whom the firearm was acquired and to whom it was sold, transferred, or otherwise disposed.  18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121-125.

8.       Glock tracks pistols that are intended for resale to the LE or Commercial Markets based on their serial numbers.

9.       To further differentiate pistols that are sold for resale to the LE Market, Glock also affixes a blue UPC code label to their pistol case, while pistols sold for resale to the Commercial Market have a white or red UPC code label affixed to their pistol case.

10.      The UPC code is based on the configuration of the pistol, including its model number, sights, trigger pull, and options.  Exhibit 5 (UPC Code Chart).

11.      Glock's independent firearm distributors participate in one or both of Glock's sales channels.

12.      Glock maintains two different price lists for these two different sales channels.

13.      The price of Glock pistols for sales to the LE Market are less than for sales to the Commercial Market.

4

14.     This price differential reflects that sales to the LE Market are routinely done on a bulk basis and are often subject to bidding or other competitive process.

15.     Section 4181 of the Internal Revenue Code provides for a Firearms and Ammunition Excise Tax ("FET"), which generally imposes an excise tax of 10% of the sales price of pistols sold by manufacturers and importers in the United States.  26 U.S.C. § 4181.

16.     As a manufacturer-importer of pistols, Glock is responsible for collecting FET and filing the requisite returns with the Alcohol and Tobacco Tax and Trade Bureau in the Department of the Treasury.

17.     The FET paid by Glock is incorporated into the price at which it sells pistols to its independent distributors.

18.     Unlike sales to the Commercial Market, sales of pistols to the LE Market may be eligible for a rebate of the FET.

19.     Sales of pistols to state or local law enforcement agencies "for their exclusive use" are eligible for a refund of the FET pursuant to 27 C.F.R. § 53.135.

20.     Upon submission of appropriate documentation from an independent distributor demonstrating that the LE pistol sale is eligible for

5

a FET refund, Glock will apply for these refunds for sales to the LE Market, which are then credited to the account of the independent distributor.

21.     To address differences in the two sales channels, Glock uses a different distributor agreement for each: (1) Glock, Inc. Law Enforcement Sales Agreement ("LE Agreements"), and (2) Glock, Inc. Commercial Distributor Agreement ("Commercial Agreements"), each of which apply for a calendar year and are subject to renewal.

22.     From late 2007 until 2011 OMB participated in both Glock's LE and Commercial sales channels.

23.     OMB was a distributor and entered into both a LE Agreement and a Commercial Agreement with Glock for each of the calendar years from 2008 to 2010.

24.     OMB's account number with Glock pursuant to its LE Agreements was 2160 and its account number with Glock pursuant to its Commercial Agreements was 1160.

25.     OMB uses the terms GK001 to refer to blue label Glock pistols purchased pursuant to its LE Agreement with Glock and GK003 to refer to red or white label Glock pistols purchased pursuant to its Commercial Agreement with Glock.  These terms are included on the invoices that OMB submits to its customers.

7

## Defendants' Conversion of LE Pistols

26.     On or about March 28, 2011, Glock was contacted by a firearm dealer, Engage Armament, regarding its suspicion that four Glock pistols it had recently purchased from OMB for sale to the Commercial Market had originally been sold by Glock to OMB for resale to the LE Market.  Exhibit 1 (Email Correspondence Between Glock and Engage Armament).

27.     OMB had removed the blue label from LE pistols that it had purchased from Glock, applied red labels, and resold them as commercial pistols.   Exhibit 2 (OMB Invoice and Firearm Sale Record to Engage Armament); Exhibit 3 (Glock's Invoices to OMB for the Pistols Resold to Engage Armament); and Exhibit 4 (Photograph of Converted Pistols OMB Sold to Engage Armament).

28.     After learning that defendants had converted LE pistols to the Commercial Market and sold them to Engage Armament, Glock conducted a review of OMB's claims for refunds of the FET for the LE pistols it had purchased and discovered a discrepancy that led it to believe that defendants may have converted a large number of LE pistols to the Commercial Market.

29.     Glock's IT department, acting under the direction and supervision of Carlos Guevara, created an Excel spreadsheet with information from

8

Glock's database on all blue label LE pistols that Glock sold to OMB from 2007 through 2011, for which OMB did not request a refund of the FET. Exhibit 6 (Spreadsheet showing LE pistols sold to OMB for which a FET refund was not requested).

30.     This spreadsheet, which was marked as Exhibit 6, consists of three tabs.   The first tab lists the serial numbers of all 83,902 blue label LE pistols that Glock shipped directly to OMB pursuant to its LE Agreements during the period from 2007 through 2011, for which OMB did not request a refund of the FET, as well as the LE price at which Glock sold them to OMB.   This first tab also identified the date of Glock's invoice to OMB for each pistol, Glock's invoice number, and OMB's purchase order number. The second tab lists the 119 different LE item numbers (UPC codes) out of the 83,902 pistols and their corresponding commercial item number and commercial price.   The third tab lists the specific pistols by serial number out of the 83,902 different pistols that are Gen4 models (the other pistols were all Gen3 models).

31.     Exhibit 6 is admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock.

32.     In response to Judge Shoob's May 24, 2012 Order (Doc. No. 36), OMB produced data files for the QuickBooks (.qbb) software that it used to

prepare invoices to its customers and the eBound (.mdb) software that it used to record its acquisition and disposition of firearms.   Exhibit 45 (QuickBooks (.qbb) and eBound (.mdb) data produced by OMB in response to Judge Shoob's May 24, 2012 Order).

33.      Counsel for Glock purchased QuickBooks Enterprise software and eBound acquisition and disposition ("A&D") software and used them to open OMB's QuickBooks (.qbb) and eBound (.mdb) data files.

34.      Using the QuickBooks Enterprise software and OMB's QuickBooks (.qbb) data file, counsel for Glock was able to print copies of OMB's invoices to its customers using its QuickBooks software in the same way that OMB did when sending an invoice to its customers.

35.      Using the eBound A&D software and eBound (.mdb) data files, counsel for Glock was able to print copies of OMB's inquiry reports showing the Glock pistols that it transferred to a particular FFL dealer on a specific day.   The inquiry reports contain the same information as the firearm sale reports that OMB printed from its eBound software and included with the invoices it sent to its customers, except that they only contain information on Glock pistols included on the invoice, not any other types of firearms that may have also been sold in the same transaction.

10

36.     Counsel for Glock printed copies of OMB's invoices to its customers for the blue label LE pistols that defendants converted to the commercial market for the period from 2008 through 2011, using the QuickBooks Enterprise software and OMB's QuickBooks (.qbb) data file, and the corresponding inquiry report from OMB's acquisition and disposition records using the eBound A&D software and OMB's eBound (.mdb) data files.  These documents were marked as Exhibit 9.

37.     Exhibit 9 is admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of OMB.

38.     Counsel for Glock retained Greg Freemyer, a computer expert originally employed by the Norcross Group and then by Intelligent Avatar, who extracted the information from OMB's QuickBooks (.qbb) and eBound (.mdb) data files in Excel format.

39.     The information that was extracted in Excel format from OMB's eBound (.mdb) data files contained the serial number of the pistols that OMB had acquired from Glock.  This allowed Glock's computer expert to match that information with the spreadsheet containing information on the serial numbers of all 83,902 blue label LE pistols that Glock shipped directly to OMB pursuant to its LE Agreements for which OMB did not request a refund of the FET.

11

40.     In addition to the serial number of the Glock pistols, the Excel
spreadsheets extracted from OMB's eBound (.mdb) data file also included
information on the quantity and model number of the Glock pistols
transferred, the name and address of the dealers to whom OMB transferred
the Glock pistols, and the date on which those pistols were transferred.

41.     The Excel spreadsheet extracted from OMB's QuickBooks (.qbb)
data file did not contain the serial number of the Glock pistols, but they did
contain information on the quantity and model number of the Glock pistols
transferred, the name and address of the dealers to whom OMB transferred
the Glock pistols and the date on which those pistols were transferred.

42.     Using the information obtained from OMB's QuickBooks (.qbb) and
eBound (.mdb) data and information from its own records, Glock was able
to determine that OMB had converted at least 14,525 blue label LE pistols
that it had purchased from Glock pursuant to its LE Agreements and sold
them to the Commercial Market.  Exhibit 7 (OMB's LE Purchase Orders to
Glock); Exhibit 8 (Glock invoices to OMB - converted LE pistols to
Commercial Market); Exhibit 9 (OMB QuickBooks invoices and eBound
records for converted LE pistols to Commercial Market); and Exhibit 10
(Summary of Converted LE Pistols).

43.    Glock produced copies of the purchase orders that OMB had submitted to it for each of the Converted LE Pistols (Exhibit 7) and the corresponding invoices that it issued to OMB for those Converted LE Pistols (Exhibit 8).

44.    Exhibits 7 and 8 are admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock.

45.    The purchase orders that OMB had submitted to Glock for the Converted LE Pistols (Exhibit 7) and the invoices that Glock issued to OMB for the blue label LE pistols it sold to OMB in response to those purchase orders (Exhibit 8) show that each of those 14,525 pistols, which are identified by serial number, were sold to OMB as blue label LE pistols.  The invoices and inquiry reports from OMB's acquisition and disposition records that OMB submitted to its customers, show that OMB converted each of those 14,525 pistols, by serial number and sold them to the Commercial Market.

46.    Counsel for Glock prepared a summary containing information taken from Exhibits 6 through 9 regarding each of the 14,525 Converted LE Pistols.  Exhibit 10 (Summary of Converted LE Pistols).  This summary shows, among other things, the serial number of each of the 14,525 Converted LE Pistols, OMB's purchase order number, the date and number

13

of Glock's corresponding invoice to OMB, the discounted LE Price at which OMB purchased the pistols, the corresponding price that it would have paid for the pistols pursuant to its Commercial Agreements and the difference between those prices.   In addition to serial number, this summary also describes each of the 14,525 Converted LE Pistols by model, inventory and part number, and contains information on the item name that OMB gave to each pistol, including the GK003 code indicating that it was sold by OMB as a commercial pistol, and a memo field from OMB's QuickBooks records, referring to the pistol being sold by OMB as a commercial or "com" pistol.  This summary also includes the name of the customer to whom OMB sold each of the 14,525 Converted LE Pistols, both the "disposition last name" from OMB's eBound acquisition and disposition records, and the "customer name" from OMB's QuickBooks records, as well as the date of the sale and the invoice number corresponding to the invoice that OMB issued to its customers.

47.      Exhibit 10 is admissible into evidence pursuant to Rule 1006 of the Federal Rules of Evidence.

48.      The total damages to Glock based on the difference in the discounted LE price and the standard commercial price that OMB should have paid pursuant to its Commercial Agreement for the 14,525 blue label law

14

enforcement pistols that it purchased from Glock pursuant to its LE
Agreements and converted to the commercial market is $783,616.  Exhibit
10 (Summary of Converted LE Pistols).

### **Defendants' Conversion of LE Magazines**

49.     The pistols that Glock sold to OMB were either Gen3 or Gen4
models.

50.     Glock provides three magazines with Gen3 pistols intended for
resale to the LE Market, but only two magazines for the same pistols
intended for resale to the Commercial Market.  All Gen4 pistols come with
three magazines, regardless of whether intended for resale to the LE or
Commercial Markets.

51.     Counsel for Glock prepared a summary containing information
limited to the Gen3 pistols in the Summary of Converted LE Pistols.
Exhibit 11 (Summary of Converted Gen3 LE Pistols).  This summary was
prepared using the Summary of Converted LE Pistols, and deleting the
columns for the discounted LE Price at which OMB obtained the pistols,
the corresponding price that it would have paid for the pistols pursuant to
its Commercial Agreements and the difference between those prices.  All of
the Gen4 pistols were eliminated from the summary, so that only the Gen3
pistols remained.  The Gen4 pistols were identified by the PG prefix in their

15

UPC Code (Part No.) and through the third tab of Exhibit 6, which identified the specific pistols by serial number for the Gen4 models out of the 83,902 blue label LE pistols for which OMB had not requested a refund of the FET.

52.     Exhibit 11 is admissible into evidence pursuant to Rule 1006 of the Federal Rules of Evidence.

53.     12,756 of the 14,525 blue label LE pistols Defendants converted to the commercial market were Gen3 models; the remaining 1,769 pistols were Gen4 pistols.  Exhibit 11 (Summary of Converted Gen3 LE Pistols).

54.     When Defendants converted a blue label LE Gen3 pistol to the commercial market, they removed the third magazine and sold it separately ("Converted Magazines").

55.     The value of the extra magazine that Defendants removed from the blue label LE Gen3 pistols that they converted to the commercial market is $17, the standard price for which Glock sold extra magazines to OMB pursuant to its LE Agreements.

56.     The Court declines to award damages for these magazines, because the evidence presented by Glock was not sufficient to demonstrate that the difference in sales prices between Converted Gen3 LE pistols and pistols meant for the commercial market did not already factor in the presence of

16

the third magazine included with the Gen3 LE pistols.  Thus, it appears Glock will recover the damages it seeks in connection with the alleged conversion of extra Gen3 LE pistol magazines as part of its recovery of damages for conversion of the Gen3 and Gen4 LE pistols.

<u>**Defendants' Conversion of Special Price Pistols**</u>

57.     OMB obtained certain LE Pistols from Glock at prices reduced from Glock's list prices for such LE Pistols on the basis of written and oral representations made to Glock by Defendants ("Special Pricing Requests") that such pistols (or an equivalent number of the same model pistols) would be sold by OMB to specific law enforcement agencies at prices reduced from OMB's list prices for such LE Pistols ("Special Price Pistols"). In submitting Special Pricing Requests, defendants made written and oral representations to Glock that reduced pricing was necessary in order for OMB to win orders from specific law enforcement agencies.  Exhibit 12 (Special Pricing Requests).

58.     Exhibit 12 is admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock and OMB.

59.     Defendants did not transfer some or all of the Special Price Pistols that they had obtained for sale to the Ada County, ID Sheriff's Office; Alabama Board of Pardons and Paroles; Anderson, IN Police Department;

17

Bexar County, TX Sheriff's Office; Buffalo, NY Police Department; Clay County, FL Sheriff's Office; Claremont, NC Police Department; Euclid, OH Police Department; Florida Department of Fish & Game; Greene County, MO Sheriff's Office; Hartford, CT Police Department; Kansas City, MO Police Department; Kansas Highway Patrol; Kokomo, IN Police Department; Lakewood, OH Police Department; Missouri Department of Corrections; Missouri Highway Patrol; Monroe County, NY Sheriff's Office; Navajo County, AZ Sheriff's Office; North Carolina Fish & Game Department; Nebraska State Patrol; New Mexico Department of Game and Fish; Oklahoma City, OK Police Department; Puerto Rico State Police; Rochester, NH Police Department; St. Lucie County, FL Sheriff's Office; Utah Department of Natural Resources; and Yale University Police Department ("Special Pricing Law Enforcement Agencies").  Exhibits 12 (Special Pricing Requests); 13 (OMB Purchase Orders to Glock for Special Price Pistols); 14 (Glock's invoices to OMB for Special Price Pistols); 15 (OMB invoices to LE agencies for Specially Price Pistols) and 16 (Special Pricing Analysis).

60.     Exhibits 13 and 14 are admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock and OMB.

61.     Counsel for Glock printed copies of OMB's invoices to LE agencies
that comprise Exhibit 15 using the QuickBooks Enterprise software and
OMB's QuickBooks (.qbb) data file.

62.     Exhibit 15 is admissible into evidence pursuant to Rule 803(6) of the
Federal Rules of Evidence as business records of OMB.

63.     Counsel for Glock prepared a summary containing information taken
from Exhibits 12 through 15 regarding each of the Special Pricing Law
Enforcement Agencies.   Exhibit 16 (Special Pricing Analysis).   This
summary shows, among other things, the names of the LE agencies for
which OMB received approval to purchase pistols at special pricing, the
model number of the pistol approved for special pricing, the discounted
special price, the regular price that OMB would have paid for the same
pistol model pursuant to its LE Agreements with Glock, and the difference
between those prices.   It also identifies OMB's purchase order number to
Glock for the Special Price Pistols, and the number of Glock's
corresponding invoice to OMB, as well as the invoice number for OMB's
invoice to the Special Pricing Law Enforcement Agencies.   The summary
identifies the total number of pistols that OMB received from Glock at
special pricing, and the total number of pistols that OMB did, and did not,
transfer to the approved LE agency at special pricing.   The summary

19

additionally notes whether OMB transferred a different model of pistol to the approved LE agency than had been authorized by Glock in response to OMB's Special Pricing Requests.

64.     Exhibit 16 is admissible into evidence pursuant to Rule 1006 of the Federal Rules of Evidence.

65.     During the time period from 2007 through 2011, defendants received a total of 14,552 Special Price Pistols from Glock that were all required to be sold to the Special Pricing Law Enforcement Agencies.   Exhibit 16 (Special Pricing Analysis).

66.     Defendants only sold 8,474 Special Price Pistols to the Special Pricing Law Enforcement Agencies, leaving 6,078 Special Price Pistols that were not transferred to the approved LE agency at Special Pricing.  Exhibit 16 (Special Pricing Analysis).

67.     The total damages to Glock from Defendants' conversion of the 6,078 Special Price Pistols that they did not transfer to the Special Pricing Law Enforcement Agencies equals $329,815.  Exhibit 16 (Special Pricing Analysis).

68.     These damages are based on the difference between the standard LE price that OMB should have paid Glock for those 6,078 pistols pursuant to

20

its Law Enforcement Distribution Agreements and the discounted special price it had paid for them.  Exhibit 16 (Special Pricing Analysis).

## **Defendants' Conversion of Sales Sample Pistols**

69.     Glock provides sale sample pistols to law enforcement distributors each year at a discounted price to be sent to law enforcement agencies for testing and evaluation purposes during that year ("Sales Sample Pistols").

70.     Distributors are contractually required to order at least five Sales Sample Pistols each contract year and are required to maintain them in inventory for the year to be sent to law enforcement agencies for testing and evaluation purposes.

71.     OMB ordered and received 230 Sales Sample Pistols from Glock for use during 2008.  Exhibit 18 (OMB's 2008 Sales Sample Purchase Order & Glock's Invoices to OMB for 2008 Sales Sample Pistols).

72.     OMB sold all 230 Sales Sample Pistols it had received from Glock for use during 2008 within the year of receipt, based on information contained in its eBound acquisition and disposition records, showing when the pistols were received from Glock and when they were sold.

73.     OMB ordered and received 408 Sales Sample Pistols from Glock for use during 2009.  Exhibit 19 (OMB's 2009 Sales Sample Purchase Order & Glock's Invoices to OMB for 2009 Sales Sample Pistols).

74.     OMB sold 405 of the 408 Sales Sample Pistols it had received from Glock for use during 2009 within the year of receipt based on information contained in its eBound acquisition and disposition records, showing when the pistols were received from Glock and when they were sold.

75.     OMB ordered and received 697 Sales Sample Pistols from Glock for use during 2010.  Exhibit 20 (OMB's 2010 Sales Sample Purchase Order & Glock's Invoices to OMB for 2010 Sales Sample Pistols).

76.     OMB sold 695 of the 697 Sales Sample Pistols it had received from Glock for use during 2010 within the year of receipt based on information contained in its eBound acquisition and disposition records, showing when the pistols were received from Glock and when they were sold.

77.     Exhibits 18 through 20 are admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock.

78.     Counsel for Glock prepared a summary containing information taken from Exhibits 18 through 20 regarding the Sales Sample Pistols.  Exhibit 44 (2008-2010 Sales Sample Summary).  This summary shows for the years 2008, 2009, and 2010, among other things, the quantity of Sales Sample Pistols that OMB purchased by model number, and the quantity of those Sales Sample Pistols that it diverted.  It also shows the discounted sales sample price that OMB paid for those pistols by model number, the

22

standard price that it would have had to pay for them pursuant to its LE Agreements with Glock, and the difference between those prices, which amounts to Glock's damages.

79.     Exhibit 44 is admissible into evidence pursuant to Rule 1006 of the Federal Rules of Evidence.

80.     For the years 2008, 2009, and 2010, OMB ordered and received a total of 1,335 Sales Sample Pistols from Glock.  Exhibit 18 (OMB's 2008 Sales Sample Purchase Order & Glock's Invoices to OMB for 2008 Sales Sample Pistols); Exhibit 19 (OMB's 2009 Sales Sample Purchase Order & Glock's Invoices to OMB for 2009 Sales Sample Pistols); Exhibit 20 (OMB's 2010 Sales Sample Purchase Order & Glock's Invoices to OMB for 2010 Sales Sample Pistols); and Exhibit 44 (2008-2010 Sales Sample Summary).

81.     OMB sold 1,330 of the 1,335 Sales Sample Pistols it received from Glock for the years 2008, 2009 and 2010, within the year it received them instead of keeping them to send to LE agencies for testing and evaluation purposes.  Exhibit 44 (2008-2010 Sales Sample Summary).

82.     The total damages to Glock based on Defendants' conversion of the 1,330 Sales Sample Pistols is $50,785.40.  Exhibit 44 (2008-2010 Sales Sample Summary).

83.     These damages are based on the difference between the standard price that OMB should have paid Glock for those 1,330 pistols pursuant to its Law Enforcement Distribution Agreements and the discounted sales sample price it had paid for them.  Exhibit 44 (2008-2010 Sales Sample Summary).

## **Defendants' Conversion of Promotional Items**

84.     Glock provided free Glock branded merchandise to OMB that was intended and required to be given away to OMB's customers without charge to promote the sale of Glock products ("Promotional Items").

85.     The Promotional Items were identical to Glock branded items that OMB purchased from Glock for resale purposes.

86.     Defendants put the Promotional Items that they received from Glock into inventory and sold them for a profit instead of giving them away without charge as required.

87.     Glock's shipping invoices for the Promotional Items provided to OMB show the price that OMB would have been required to pay if it was purchasing them for purposes of resale for accounting purposes, even though they were provided to OMB without charge.  Exhibit 21 (Glock's Shipping Invoices to OMB for Promotional Items).

24

88.     Counsel for Glock prepared a summary containing information taken from Exhibit 21 regarding the Promotional Items.  Exhibit 21 (Promotional Items Summary).  This summary identifies the invoice number, the date of the invoice, and the total value of the Promotional Items provided.

89.     Exhibit 21 is admissible into evidence pursuant to Rule 803(6) of the Federal Rules of Evidence as business records of Glock (Glock's Shipping Invoices to OMB for Promotional Items) and pursuant to Rule 1006 of the Federal Rules of Evidence (the Promotional Items Summary).

90.     The damages to Glock related to the Promotional Items that defendants sold instead of gave away are $51,595.17.   Exhibit 21 (Promotional Items Summary and Glock's Shipping Invoices to OMB for Promotional Items).

91.     These damages are based on the price that OMB would have had to pay Glock for the Promotional Items if it was purchasing them for purposes of resale.  Exhibit 21 (Promotional Items Summary and Glock's Shipping Invoices to OMB for Promotional Items).

### Conversion Damages Computation

92.     The total damages that Glock incurred related to defendants' conversion of Converted LE Pistols, Converted Magazines, Special Price

Pistols, Sales Sample Pistols, and Promotional Items ("Conversion Damages") amount to $1,215,811.57.

93.     Pursuant to the Georgia Civil RICO Act, Glock is entitled to have the Conversion Damages trebled to $3,647,434.71.   O.C.G.A. § 16-14-6(c) (plaintiff "shall have a cause of action for three times the actual damages sustained").

### Defendants' Unauthorized Registration of Internet Domain Names Using Glock's Trademark (Cybersquatting)

94.      Glock is the owner of federal trademark registration No. 1,691,390 for the word mark "GLOCK," which was registered on June 9, 1992 by the United States Patent and Trademark Office ("USPTO") in international class of goods 13 (pistols and holsters).

95.     OMB illegally registered eight Internet domain names containing the word "Glock" in violation of Glock's trademark rights.

96.     Ralph illegally registered an additional eight Internet domain names containing the word "Glock" in violation of Glock's trademark rights.

97.     Pursuant to 15 U.S.C. § 1117(d), Glock is entitled to  recover "statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just," for each one of the sixteen Internet domain names containing the word "Glock" that defendants registered.

26

98.       "[T]he court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1336 (9th Cir. 1990) (citation and internal quotation marks omitted). "In determining 'just' damages, courts have considered the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a 'serial' cybersquatter . . . and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings." *Kohler Co. v. Domainjet, Inc.,* No. 11-CV-1767 BEN (KSC), 2012 WL 12868267, at *5 (S.D. Cal. Dec. 11, 2012) (awarding $500,000 for violations for five sites).  Damages awards can vary significantly.  *Compare Shields v. Zuccarini*, 254 F.3d 476, 487 (3d Cir. 2001) (district court awarded $10,000 in damages for single violation) *with Media Lab, Inc. v. Collis*, No. C08-04732 HRL, 2010 WL 3893582, at *6 (N.D. Cal. Sept. 30, 2010) (awarding $200,000, or $50,000 per site, for cybersquatting on four sites).

99.       Here, Defendants registered sixteen names in violation of Glock's trademark rights, most or all of which redirected to Defendant OMB's website.  (Am. Compl. ¶ 160.)  The Court therefore finds that defendants were "serial" cybersquatters and that this justifies awarding Glock $10,000

for each violation, or $160,000.00.  OMB shall be liable for $80,000.00 of this amount for the eight sites it registered, and Ralph shall be liable for the remaining $80,000.00 of this amount for the eight sites he registered.

## Defendants' Manufacture and Sale of Counterfeit Clothing Bearing
## Glock's Trademarks (Trademark Counterfeiting & Infringement)

100.    Glock is the owner of federal trademark registration  No. 2,694,347 for the "Glock" stylized trademark, which was registered on March 11, 2003 by the USPTO in international class of goods 25 (clothing/apparel).

101.     Glock is the owner of federal trademark registration No. 3,322,148 "Team Glock" stylized trademark, which was registered on March 11, 2003 by the USPTO in international class of goods 25 (clothing/apparel).

102.    Defendants manufactured and sold clothing/apparel using the Glock and Team Glock stylized trademarks without Glock's permission in violation of the Lanham Act, 15 U.S.C. § 1114.

103.    Pursuant to 15 U.S.C. § 1117(c)(1), Glock is entitled to recover statutory damages in an amount of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just," for the use of the "Glock" stylized trademark and the "Team Glock" stylized trademark on clothing/apparel.

104.    "[T]he pertinent considerations in deciding the amount of such an award encompass both the degree of the defendant's culpability and the extent of the injury caused.  Relevant factors include "the profits reaped

and the expenses saved by the infringer, the revenues lost by the plaintiff, the value of the [mark], the need to deter potential infringers, the degree of willfulness or the innocence of the defendant, the defendant's cooperativeness in providing information relevant to proof of profits and losses, and the need to deter the defendant from future misconduct." *Mun. Credit Union v. Queens Auto Mall, Inc.*, 126 F. Supp. 3d 290, 296-97 (E.D.N.Y. 2015).

105.     Here, there is limited evidence as to how much defendants actually profited from these sales, and how many items they actually sold.  The Court therefore only awards $1,000.00 per mark, for a total of $2,000.00.

## Attorney Fees, Costs and Expenses

106.     Glock is entitled to recover attorney fees it incurred in connection with investigating the bribes that defendants were paying to its managers, Craig Dutton and Bo Wood, prior to filing the complaint in this case pursuant to the Georgia Civil RICO Act, O.C.G.A. § 16-14-6(c).  However, as discussed below, the Court will reduce these fees by 20%.

107.     Counsel for Glock prepared a summary containing information from the legal invoices that Renzulli Law Firm, LLP issued to Glock in connection with investigating the bribes that defendants were paying to its managers, Craig Dutton and Bo Wood, prior to filing the complaint in this

30

case.  This summary identifies the invoice number, the date of the invoice, the amount of legal fees charged, the amount of expenses charged, and the total amount for each invoice issued.  Exhibit 46 (Summary of legal invoices from Renzulli Law Firm, LLP regarding investigation into allegations that defendants had been paying bribes to Craig Dutton and Bo Wood).

108.    The attorney fees that Glock incurred in connection with investigating the bribes that defendants were paying to its managers, Craig Dutton and Bo Wood prior to filing the complaint in this case amount to $121,276.08.  Exhibit 46 (Summary of legal invoices from Renzulli Law Firm, LLP regarding investigation into allegations that defendants had been paying bribes to Craig Dutton and Bo Wood).  This figure includes $118,172.75 in fees and $3,103.33 in expenses.

109.    Glock is entitled to recover the attorney fees it incurred in connection with this case against OMB pursuant to its 2008-2010 Commercial and Law Enforcement Distributor Agreements with OMB.

110.    Glock is entitled to recover the attorney fees it incurred in connection with this case against both John Ralph and OMB pursuant to the Georgia Civil RICO Act, O.C.G.A. § 16-14-6(c) (plaintiff "shall also recover attorney's fees in the trial and appellate courts and costs of

31

investigation and litigation reasonably incurred"), and the Lanham Act, 15 U.S.C. § 1117(a).

111.     Counsel for Glock prepared summaries containing information from the legal invoices that Renzulli Law Firm, LLP and Miller & Martin PLLC issued to Glock in connection with this case through June 30, 2017. The summaries identify the invoice number, the date of the invoice, the amount of legal fees charged, the amount of expenses charged, and the total amount for each invoice issued. Exhibit 47 (Summary of legal invoices from Renzulli Law Firm, LLP through June 30, 2017); Exhibit 48 (Summary of legal invoices from Miller & Martin, PLLC through June 30, 2017).

112.     The attorney fees and expenses that Glock incurred in connection with this case from Renzulli Law Firm, LLP, and Miller & Martin PLLC, through June 30, 2017, amount to $1,873,032.39, not inclusive of the fees and expenses incurred in Glock's pre-filing investigation. Exhibit 47 (Summary of legal invoices from Renzulli Law Firm, LLP through June 30, 2017); Exhibit 48 (Summary of legal invoices from Miller & Martin, PLLC through June 30, 2017). As discussed below, the Court finds that Glock is not entitled to recover all of these fees. The total fees at issue are

32

$1,907,157.75, and the expenses at issue amount to $87,150.72, inclusive of the pre-filing investigation fees and expenses.  (*See* Doc. 238 at 4.)

113.     Exhibits 46, 47 and 48 are admissible into evidence pursuant to Rule 1006 of the Federal Rules of Evidence.  Copies of the legal invoices from Renzulli Law Firm, LLP and Miller & Martin PLLC that were summarized in Exhibits 46-48 were provided to the Court for review *in camera*.

114.     As stated above, Glock is entitled to attorney's fees both under its contract with OMB and under Georgia's RICO statute.  Those fees must still be reasonable.  The determination of a reasonable attorney's fee is left to the sound discretion of the trial judge after proper application of a lodestar fee analysis.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Natco, Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1196 (11th Cir. 2001) (on appeal, reviewing fee award for abuse of discretion and applying *Hensley* analysis); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (11th Cir. 1999) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).  The starting pointing for calculating a reasonable attorney's fee award is the determination of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433 (1983); *Norman v. Housing Auth.*, 836 F.2d 1292, 1299 (11th Cir. 1988).  The product of this formula is the

"lodestar." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (per curiam).   However, the extent of a plaintiff's success may warrant an adjustment of the lodestar fee upward or downward based on the results obtained.  *Hensley*, 461 U.S. at 434-440; *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000).

115.    Plaintiff, as the party seeking an award of fees here, bears the burden of demonstrating the reasonableness of the attorney hours worked and the rates claimed.  *Hensley*, 461 U.S. at 433; *Norman*, 836 F.2d at 1304.  This is true even though Glock argues that its contract with OMB did not limit the recovery of fees under its provisions to "reasonable" fees.  *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846, F.3d 1159, 1165 (11th Cir. 2017) (reversing district court's fee reduction and noting that parties' contract did not limit prevailing party to "reasonable fees," but noting that, [a]t the end of the day, the substantive reasonableness of the amount awarded is the touchstone of our evaluation of a district court's award of fees and costs.")

116.    In this case, Glock reviewed over 120,000 pages of documents, deposed seventeen people,[4] and fought off or filed numerous substantive

---

[4] A good number of these depositions were lengthy.  (Ex. 47, February 13, 2013 Invoice at 10 ("lengthy" deposition of Bo Wood); March 5, 2013 Invoice at 7 (8.5 hours spent on deposition of Craig Dutton); July 10, 2013 Invoice at 16-18 (detailing time spent on 2-day Rule 30(b)(6) deposition of OMB.)

and discovery motions. (Doc. 238 at 8-11.) Glock also presented evidence at a damages hearing that lasted several hours. However, the case never went to trial. In addition, Glock's itemized bills provide great detail about the tasks its attorneys engaged in, but it is also rife with block billing that makes it difficult to evaluate the substantive reasonableness of its request. (*E.g.,* Ex. 46, August 6, 2012 invoice at 17.) The Court notes that Glock broke down its fees by year (Doc. 238), but was unable to do so by task, so the Court is hard-pressed to determine the number of hours spent on summary judgment motions, motions to compel, and the like. This too makes Glock's fee request difficult to evaluate. Other courts have imposed across-the-board reductions for block billing. The amount of this reduction can vary widely. *Compare JCC, LLC v. LeFevre*, No. 8:09-CV-551-T-17EAJ, 2011 WL 5597305, at *8 (M.D. Fla. Oct. 11, 2011), r*eport and recommendation adopted sub nom. BCJJ, LLC v. LeFevre*, No. 8:09-CV-551-T-17EAJ, 2011 WL 5597349 (M.D. Fla. Nov. 17, 2011) (imposing 10% reduction for block billing) *with BWP Media USA, Inc. v. Mishka NYC LLC*, 2016 WL 8309676, at *6-7 (E.D.N.Y. Dec. 28, 2016) (citing several cases that imposed 25 to 33 percent reductions for block billing). Here, the Court finds that an across-the-board reduction of 20% is appropriate for two primary reasons. First, some, though not all, of Glock's fee entries included block billing that make evaluating the reasonableness of the fee

request difficult.  Second, Glock did not segregate out the hours spent on particular tasks, thus making it difficult to evaluate the amount of time spent on tasks such as summary judgment briefing.  That being said, the Court heard extensive testimony from Glock on the reasonableness of its fees, its client has paid those fees, and Glock's attorneys' time entries are detailed.[5]  A substantial fee award is therefore warranted – just not quite as substantial as Glock would like.  After reviewing Glock's fee request for its reasonableness, the Court awards $1,525,726.20 in fees (80% of $1,907,157.75,) in attorney's fees to Glock.  The Court also awards to Glock expenses totaling $87,150.72.

### The Criminal Restitution Ralph was Ordered to Pay to Glock is Separate from, and in Addition to, the Damages to be Awarded to Glock in this Case

117.     The $883,098.23 in criminal restitution that Ralph was ordered to pay to Glock pursuant to the second amended judgment entered against him by Judge Crabtree of the U.S. District Court for the District of Kanas

---

[5] The Court notes that Glock's attorneys spent a significant amount of time grappling with a large document production from Defendant OMB, including OMB's sales records for various types of pistols.  It is evident from Glock's records that much of this time was necessary to allow Glock's attorneys to synthesize and present this data.  On the other hand, it is difficult to tell just *how much* time was devoted to these discovery tasks given Glock's block billing practices.  (*E.g.*, Ex. 47, July 10, 2012 Invoice at 6-22.)

36

on December 28, 2015 in the case of *United States v. Ralph*, No. 5:14-CR-40066-DDC, relates to damage to Glock's reputation and national distribution network. Exhibits 22 (Second Amended Judgment in Criminal Case) and 23 (Restitution Order in Criminal Case).

118.     In this case, Glock did not request an award of monetary damages for the damages defendants caused to Glock's reputation and national distribution network during the August 8-10, 2017 damages hearing.  The damages being awarded to Glock pursuant to the entry of default judgment against OMB and Ralph therefore do not include any amount related to the damages defendants caused to Glock's reputation and national distribution network.  Accordingly the damages being awarded to Glock in this case shall not be reduced or offset by the $883,098.23 in criminal restitution that Ralph was ordered to pay pursuant to the second amended judgment in the case of *United States v. Ralph*.  Judge Crabtree ordered restitution under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A(c)(1)(A)(ii), which only permits a court to compensate a victim for losses proximately caused by the *criminal offense* at issue.  Under the MVRA, any amount paid to a victim under an order of restitution must be reduced by any amount later recovered as compensatory damages for the "same loss" by the victim in a federal proceeding.  18 U.S.C. § 3664(j)(2)(A).  At least some circuit courts have concluded that victims of

37

fraud are "not entitled to double recover for the same loss through both a restitution order and a civil judgment." *United States v. Manzer*, 69 F.3d 222, 230 (8th Cir. 1995). However, if the violations at issue in the civil and criminal cases are different, then the MVRA does not bar recovery. *See id.*[6] Here, Judge Crabtree only ordered restitution for Glock's reputational harms, but expressly declined to award Glock restitution for the lost-profits-like damages it now seeks.

Moreover, unlike restitution under the MVRA, "the concept of civil damages is very broad, incorporating many different kinds of compensation for an injury or loss," and so district courts have awarded civil damages even when a sentencing court declined to award restitution in a related criminal proceeding. *Eli Lilly and Company v. Gitmed*, 2017 WL 1740132, at * 3-4 (E.D. Cal. May 4, 2017) (citing multiple cases where a trial court rejected the claim that a restitution order limited a party's ability to seek civil damages); *see also Cagan v. Gadman*, 2010 WL 1686949, at *4-5 (E.D.N.Y. April 1, 2010) (collecting cases holding that "a prior criminal restitution order has never been applied as res judicata precluding a subsequent damages action). Thus, there is no need to offset Glock's damages by the restitution awarded in the criminal case.

---

[6] The Eleventh Circuit appears not to have addressed the issue. *United States v. Joseph*, 743 F.3d 1350, n.4 (11th Cir. 2014) (declining to reach issue but noting "at least one circuit has concluded that an offset [for the same loss] would be required to prevent . . . double recovery).

## **Allocation of Damages Among Defendants**

119.     OMB and Ralph are jointly and severally liable for the Conversion
Damages awarded to Glock pursuant to its causes of action for fraud and
violation of the Georgia Civil RICO Act, and the statutory damages to be
awarded to Glock pursuant to the Lanham Act for trademark counterfeiting
and infringement.  OMB and Ralph are jointly and severally liable for the
statutory damages to be awarded to Glock pursuant to the Lanham Act for
cybersquatting related to the eight Internet domain names containing the
word "Glock" that OMB registered in violation of Glock's trademark.
O.C.G.A. § 51-12-30; *Lyons v. O'Quinn*, 607 Fed. Appx. 931, 935 (11th Cir.
2015); *Velten v. Lippert*, 985 F.2d 1515, 1521-22 (11th Cir. 1993); *Smith v.
Hawks*, 335 S.E.2d 669, 675 (Ga. Ct. App. 1987).

120.     OMB would be solely liable for the Conversion Damages awarded to
Glock pursuant to its cause of action for breach of contract.  The Court
awards no damages for this claim because it is awarding damages for the
same harm pursuant to Georgia RICO and because Glock's evidence at the
damages hearing was focused on their RICO theory.

121.     Ralph is solely liable for the statutory damages to be awarded to
Glock pursuant to the Lanham Act for cybersquatting related to the eight

additional Internet domain names containing the word "Glock" that Ralph registered in violation of Glock's trademark.

122.     The Court finds that any damages requested by Glock but not awarded by the Court herein were not supported by the evidence or were duplicative.

123.     The Clerk is **DIRECTED** to **RE-OPEN** this case and **ENTER JUDGMENT**[7] in favor of Glock and against Defendants as follows:

   a.  $3,647,434.71 in conversion-related damages awarded to Glock in connection with its causes of action for fraud and under Georgia's RICO statute, OCGA § 16-14-4, against both Ralph and OMB.

   b.  $2,000.00 in statutory damages under the Lanham Act, 15 U.S.C. § 1114, for trademark violations against both Ralph and OMB.

   c.  $80,000 under the Lanham Act, 15 U.S.C. § 1125(d), for cybersquatting against both Ralph and OMB.

   d.  An additional $80,000.00 under the Lanham Act, 15 U.S.C. § 1125(d), for cybersquatting against Ralph.[8]

---

[7] The Clerk is **DIRECTED** to close the case again after entering judgment.
[8] The total judgment, exclusive of attorney's fees and expenses, is $3,809,434.71.

e.  The Court further awards $1,525,726.20 in attorney's fees in favor of Glock and against Ralph and OMB, pursuant to Georgia RICO. OCGA § 16-14-6.

f.  The Court also awards expenses totaling $87,150.72 in favor of Glock and against Ralph and OMB, pursuant to Georgia RICO. OCGA § 16-14-6.

**IT IS SO ORDERED** this 25th day of September, 2017.

_____
Amy Totenberg
United States District Judge

41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**                          **No.** 14-40066-01-05-DDC

**1) JOHN SULLIVAN RALPH III,**

**2) JAMES CRAIG DUTTON,**

**3) LISA DELAINE DUTTON,**

**4) WELCOME D. WOOD, JR.
a.k.a. "BO" WOOD**

**5) PAULA ANN WOOD,**

**Defendants**.

## INDICTMENT

***BACKGROUND:***

At all times relevant to this Indictment :

### Introduction:

1.      The defendant, JOHN SULLIVAN RALPH III, paid kickbacks and bribes to

defendants JAMES CRAIG DUTTON, and WELCOME D. WOOD, JR., a.k.a. "BO"

WOOD, high ranking executives of Glock, a firearms manufacturer, to receive preferential

treatment over other distributors of firearms including, directing potential customers to

OMB, giving it priority relative to the allocation of limited products, steering of government

contracts and sales to government agencies of firearms and accessories to OMB, as well

1



as providing confidential Glock information to RALPH and OMB. Defendants LISA

DELAINE DUTTON and PAULA ANN WOOD, conspired and aided and abetted their

co-conspirators by concealing the payment of bribes and kickbacks and their purpose.

***Relevant Entities and Individuals:***

2.      Glock Incorporated (Glock) is a Georgia corporation with its principal place

of U.S. business in Smyrna, Georgia.   Glock manufactures and sells pistols and firearm

accessories.   Most of Glock's pistol sales are made to independent firearm distributors

who have contracts with Glock to resell its pistols.   Glock has a formal, written

Employment Policy Handbook which explicitly prohibits actual or potential conflicts of

interest.   This policy also obligates its employees to conduct business within guidelines

that are in the best interests of Glock.   Each year, Glock employees receive a copy of the

Employment Policy Handbook and ethics training at the national sales meeting.   As

high-ranking managers of Glock, defendants JAMES CRAIG DUTTON and WELCOME

D. WOOD, JR., a.k.a. "BO" WOOD owed Glock a fiduciary duty to make

recommendations and decisions in the best interests of Glock.

3      Defendant JAMES CRAIG DUTTON was and is a resident of Georgia, and

was Glock's Assistant National Sales Manager.   As Assistant National Sales Manager,

Dutton supervised all of Glock's Regional and District Managers, as well as the daily

operations of Glock's law enforcement ("LE") and commercial sales departments,

customer service department, and the Stocking Dealer Program.   Dutton was

responsible for allocation of Glock firearms among Glock's distributors.   Allocation of

Glock pistols was important because the demand frequently exceeded the supply.

2

Dutton received monthly reports from Glock's Regional and District Managers that included highly confidential information, including information on Glock's distributors, and which LE agencies were looking to purchase firearms.

4.     Defendant LISA DELAINE DUTTON was and is JAMES CRAIG DUTTON's wife.   On or about May 14, 2009, LISA DELAINE DUTTON formed and/or organized Supreme Solutions LLC (SSLLC) in Georgia.   On or about June 12, 2009, LISA DELAINE DUTTON opened a Regions Bank checking account for SSLLC with an account number ending in 3329 at a branch located in Dallas, Georgia.   LISA DELAINE DUTTON had sole signatory authority on SSLLC's bank account at Regions Bank which had an account number ending in 3329.

5.     Defendant WELCOME D. "BO" WOOD JR., was and is a resident of Florida, and was Glock's Eastern Regional Manager.   The Eastern Region contains approximately half of the LE agencies in the United States and more LE agencies than the Central and Western Regions combined.   As Glock's Eastern Regional Manager, Wood knew what LE agencies in his region were seeking to purchase pistols, as well as what the LE distributors were bidding to supply them with Glock pistols.   Wood also received copies of the monthly reports from the Central and Western Regional Managers, as well as the district managers in their regions.

6.     Defendant PAULA ANN WOOD, was and is WELCOME "BO" WOOD JR's wife.   On or about May 12, 2009, PAULA ANN WOOD formed and/or organized Tropical Marketing & Consulting LLC (TMC) in Florida.   On or about May 21, 2009, PAULA ANN WOOD opened a Wachovia Bank checking account for TMC with an account number

3

ending in 8245 at a branch located in Oviedo, Florida.   PAULA ANN WOOD had sole signatory authority on TMC's bank account at Wachovia Bank which had an account number ending in 8245.

7.     Defendant JOHN SULLIVAN RALPH III was a resident of Olathe, Kansas, and was the Owner/Manager of Global Guns & Hunting, Inc. d/b/a OMB Guns ("OMB") a federally licensed independent distributor of firearms.   Prior to 2008 OMB Police Supply, Inc., was a predecessor of OMB and participated in both Glock's LE and Commercial sales channels and was run by defendant JOHN SULLIVAN RALPH III and his brother Bob Ralph and their father Jack Ralph.   In late 2007, defendant JOHN SULLIVAN RALPH III, left OMB Police Supply and moved the Glock account to OMB, a corporation he owned and controlled.

8.     Glock created two different sales channels for purposes of licensing its independent distributors. One channel is for sales to the Law Enforcement market ("LE Market"), which includes Federal, State and local law enforcement agencies across the United States.   Independent distributors are authorized to resell Glock pistols to the LE Market within a specified geographic territory.   The other channel is the "Commercial Market" for most other sales, which are not restricted to a particular geographic area.

9.     Prior to 2008, OMB Police Supply, Inc. ("OMB Police Supply"), a predecessor of OMB, had participated in both Glock's LE and Commercial sales channels.   From late 2007 until 2011 OMB participated in both Glock's LE and Commercial sales channels.   From late 2007 until December 31, 2010, the majority of OMB's revenues and profits were on account of its sales of Glock pistols.

4

10.     A UPC Code is a method used by manufacturers to identify products quickly.   UPC stands for "Universal Product Code."   A UPC code generally has two parts - numbers, which people can read, and a series of bars which can be scanned and tracked by computers.   To differentiate pistols that are sold for resale to the LE Market, Glock affixes a blue UPC code label to their pistol case, while pistols sold for resale to the Commercial Market have a white or red UPC code label affixed to their pistol case.

11.     Glock maintains two different price lists for these two different sales channels.   The price list for sales to the LE Market are less than for sales to the Commercial Market. This price differential reflects that sales to the LE Market are routinely done on a bulk basis and are often subject to bidding or other competitive process.

12.     In addition to the price differential, Glock Gen3 (3rd generation pistols) intended for resale to the LE Market include three magazines, instead of the two magazines included with pistols intended for resale to the Commercial Market.

## **Count 1**
## **Conspiracy**

13.     Paragraphs 1 through 12 of the Introduction are re alleged and incorporated fully herein by reference.

14.     Beginning about 2003, and continuing through 2011, in the District of Kansas and elsewhere, the defendants

JOHN SULLIVAN RALPH III,
JAMES CRAIG DUTTON,
WELCOME D. WOOD, JR., a.k.a. "BO" WOOD,

5

LISA DELAINE DUTTON, and
PAULA ANN WOOD,

did knowingly, willfully and unlawfully conspire, confederate, and agree with each other

and persons known and unknown to the Grand Jury to commit offenses against the

United States as follows:

A.     having devised and intending to devise a scheme and artifice to defraud Glock of the intangible right of honest services, and OMB competitors, who were entitled to fundamental honesty, fair play and right dealing, for the purpose of executing and attempting to execute said scheme and artifice, places in any post office and authorized depository for mail matter, any matter and thing to be sent and delivered by the Postal Service in violation of Title 18, United States Code, Sections 2, and 1341; and, transmit in interstate and foreign commerce any writings, signs, signals, pictures and sounds, for the purpose of executing said scheme and artifice to defraud, in violation of Title 18, United States Code, Sections 2 and1343; and,

B.     to unlawfully and knowingly conduct financial transactions affecting interstate and foreign commerce, involving the proceeds of a specified unlawful activity, namely, mail fraud in violation of Title 18 United States Codes, Section 1341, and wire fraud in violation of Title 18 United States Code Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the scheme and conspiracy and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 2 and1956(a)(1)(B)(i); and,

C.     to knowingly and willfully make materially false, fictitious, or fraudulent statement(s) or representation(s) to Federal Bureau of Investigation (FBI) Special Agents (SAs) during the FBI's criminal investigation of the defendants' scheme, in violation of Title 18 United State Code, Sections 2 and 1001.

***Manner and Means of Committing the Conspiracy and Scheme to Defraud:***

15.     In furtherance and execution of the conspiracy and scheme to defraud,

6

defendants Dutton and Woods deceived their employer Glock by depriving the employer of the honest services of the employees, free from self-dealing and conflicts of interest and included the nondisclosure or concealment of the bribes and kickbacks being paid to them by defendant the JOHN SULLIVAN RALPH III, while pretending loyalty to Glock, when in fact the defendants were participating in a bribery or kickback scheme.

16.     In furtherance and execution of the conspiracy and scheme to defraud, the defendants Wood and Dutton provided defendant Ralph with the equipment and/or software that would allow him to convert Blue Label firearms, which were sold by Glock to Ralph at a discount, to Red or White label firearms that were sold at a premium to the commercial market. Ralph sold at least 14,000 blue label LE pistols that it had purchased from Glock pursuant to its LE agreements to the commercial market, most of these pistols going to Cabelas.

17.     In furtherance and execution of the conspiracy and scheme to defraud defendant Ralph would cause the third magazine, that would be available for the LE sale, to be removed and sold separately, allowing for additional revenue and profit on in excess of 12,000 Converted Magazines, selling most of these to Midwest Gun Exchange.

18.     In furtherance and execution of the conspiracy and scheme to defraud, defendants DUTTON and WOOD secretly used their positions to enrich themselves by soliciting and accepting gifts, payments, and other things of value from defendant RALPH and OMB in exchange for favorable and preferential action, to enrich the payors by secretly obtaining favorable and preferential treatment through fraudulent means.

19.     In furtherance and execution of the conspiracy and scheme to defraud, the

defendants DUTTON and WOOD solicited and accepted gifts, payments, and other things of value totaling more than $1,000,000 from defendants JOHN SULLIVAN RALPH III and OMB.

***Overt Acts:***

20.    Between 2003 and 2009, in furtherance and execution of the scheme to defraud, the defendants JOHN SULLIVAN RALPH III and OMB did knowingly utilize the U.S. Postal Service and/or private or commercial interstate carrier to send and receive approximately 140 discreet bribes and kickbacks delivered to defendants LISA DELAINE DUTTON and PAULA ANN WOOD, to conceal the fact that such payments were to enrich their husbands for providing preferential treatment to Ralph and OMB.

21.    Between 2009 and 2011, in furtherance and execution of the scheme to defraud, the defendants JOHN SULLIVAN RALPH III and OMB, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs signals, pictures and sounds, consisting of electronic wire transfers of funds on more than 40 discreet transfers of bribes and kickbacks to LISA DELAINE DUTTON and/or Supreme Solutions (SSLLC), an LLC formed by her for purposes of concealing the source and purpose of the funds.

22.    Between 2009 and 2011, in furtherance and execution of the scheme to defraud, the defendants JOHN SULLIVAN RALPH III and OMB, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signals, and sounds, consisting of electronic wire transfers of funds on more than 40 discreet transfers of bribes and kickbacks to PAULA ANN WOOD and/or Tropical

Marketing & Consulting ("TMC"), an LLC formed by her for purposes of concealing the source and purpose of the funds.

23.     The defendant also committed overt acts consisting of the substantive crimes of wire fraud and money-laundering as set forth in Counts 2 through 22 which follow.

24.     The foregoing is all in violation of Title 18 United States Code Section 371.

## Counts 2 through 12
### Wire Fraud

25.     Paragraphs 1 through 24 of the indictment are re alleged and incorporated fully herein by reference.

26.     Between on or about June 4, 2009, and March 31, 2011, from the District of Kansas, to the states of Georgia and Florida and elsewhere, the defendants,

JOHN SULLIVAN RALPH III,
JAMES CRAIG DUTTON,
WELCOME D. WOOD, JR., a.k.a. "BO" WOOD,
LISA DELAINE DUTTON, and
PAULA ANN WOOD,

for the purpose of executing the material scheme to defraud Glock and distributors competing against OMB, transmits in interstate and foreign commerce any writings, signs, signals, pictures and sounds as follows:

| Count | Date | Transmission |
|---|---|---|
| 2 | June 4, 2009 | OMB wire transfer of $10,000 to defendant PAULA ANN WOOD's TMC |
| 3 | June 12, 2009 | OMB wire transfer of $10,000 to defendant PAULA ANN WOOD's TMC and on June 15, 2009, WOOD sent a check to LISA DELAINE DUTTON's SSLLC for $10,000 |

9

| 4 | June 26, 2009 | OMB wire transfer of $15,000 to LISA DELAINE DUTTON's SSLLC and DUTTON sent a check to PAULA ANN WOOD's TMC for $7,500 |
| 5 | August 4, 2009 | OMB wire transfer of $15,000 to LISA DELAINE DUTTON's SSLLC |
| 6 | August 12, 2009 | OMB wire transfer of $5,500 to LISA DELAINE DUTTON's SSLLC |
| 7 | August 14, 2009 | OMB wire transfer of $5,000 to LISA DELAINE DUTTON's SSLLC |
| 8 | August 4, 2009 | OMB wire transfer of $15,000 to defendant PAULA ANN WOOD's TMC |
| 9 | August 12, 2009 | OMB wire transfer of $5,500 to defendant PAULA ANN WOOD's TMC |
| 10 | August 14, 2009 | OMB wire transfer of $5,000 to defendant PAULA ANN WOOD's TMC |
| 11 | August 31, 2009 | OMB wire transfer of $5,000 to defendant PAULA ANN WOOD's TMC |
| 12 | September 15, 2009 | OMB wire transfer of $5,000 to defendant PAULA ANN WOOD's TMC |

27.    Counts 2 through 12 are all in violation of Title 18 United States Code, Sections 2 and1343.

28.    Between 2003 and 2011, defendant JOHN SULLIVAN RALPH III and OMB provided the defendants JAMES CRAIG and LISA DELAINE DUTTON, and defendants WELCOME D. and PAULA ANN WOOD, more than $1,000,000 in monetary and non-monetary bribes and kickbacks.

29.    As noted previously in this indictment, in the same month, May of 2009, within two days of each other, defendant LISA DELAINE DUTTON formed and/or organized Supreme Solutions LLC (SSLLC) in Georgia, and defendant PAULA ANN WOOD formed and/or organized Tropical Marketing & Consulting LLC (TMC) in Florida. See paragraphs 4 and 6 above.   SSLLC and TMC were formed by the defendants for the purpose of concealing the source and purpose of payments from defendant JOHN SULLIVAN RALPH III and OMB as bribes and kickbacks to their defendant husbands in

10

exchange for receiving preferential treatment.

30.     As noted above, within three weeks of each other, defendant LISA
DELAINE DUTTON opened a Regions Bank checking account for SSLLC in Georgia and
defendant PAULA ANN WOOD opened a Wachovia Bank checking account for TMC in
Florida.   The creation of these accounts were intended to provide an additional layer of
concealment of the source and purpose of payments from defendant JOHN SULLIVAN
RALPH III and OMB as bribes and kickbacks to their defendant husbands in exchange for
receiving preferential treatment.

31.     Subsequent to the payments to the wives and the wives' companies, the
defendants agreed that the money would be transferred to other bank accounts for the
Dutton and Wood families.

32.     Beginning on or about March 29, 2011, the defendants JAMES CRAIG
DUTTON, LISA DELAINE DUTTON, WELCOME D. "BO" WOOD JR., and PAULA ANN
WOOD talked with each other on the telephone in an effort to coordinate some or all of the
following false, fictitious, and/or fraudulent statements and representations, knowingly
and willfully made to representatives of the Federal Bureau of Investigation, an agency of
the United States:

    A.     The money from RALPH and/or OMB was completely unrelated to
    Glock.
    B.     The money from RALPH and/or OMB compensated the wives for
    work for RALPH/OMB.
    C.     The money from RALPH and/or OMB was based friendship and/or
    RALPH's generosity.
    D.     PAULA ANN WOOD was unaware that the DUTTONS received
    similar money from RALPH/OMB.
    E.     LISA DELAINE DUTTON did not know why PAULA ANN WOOD
    received similar money from RALPH/OMB.

11

      F.     LISA DELAINE DUTTON formed SSLLC without direction or coordination with PAULA ANN WOOD or RALPH
.

## Counts 13 through 22
## Money-Laundering

33.    Paragraphs 1 through 32 of the indictment are re alleged and incorporated fully herein by reference.

34.    From on or about 2003 to on or about 2011, in the District of Kansas and elsewhere, the defendants

JOHN SULLIVAN RALPH III,
JAMES CRAIG DUTTON, and
WELCOME D. WOOD, JR., a.k.a. "BO" WOOD,
LISA DELAINE DUTTON,
PAULA ANN WOOD

did knowingly wilfully and unlawfully conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of the specified unlawful activity, including, but not limited to, mail fraud in violation of 18 U.S.C. 1341 and wire fraud in violation of 18 U.S.C. 1343, knowing that the transactions identified below were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i):

12

| Count | Date | Transaction |
|---|---|---|
| 13 | November 1, 2010 | Transfer of $2000 from PAULA ANN WOOD's TMC business account to the personal accounts of defendants WELCOME D. and PAULA ANN WOOD |
| 14 | November 1, 2010 | Transfer of $2000 from PAULA ANN WOOD's TMC business account to the personal accounts of defendants WELCOME D. and PAULA ANN WOOD |
| 15 | November 1, 2010 | Transfer of $2000 from PAULA ANN WOOD's TMC business account to the personal accounts of defendants WELCOME D. and PAULA ANN WOOD |
| 16 | November 16, 2010 | Transfer of $3000 from PAULA ANN WOOD's TMC business account to the personal accounts of defendants WELCOME D. and PAULA ANN WOOD |
| 17 | December 2, 2010 | Transfer of $3000 from PAULA ANN WOOD's TMC business account to the personal accounts of defendants WELCOME D. and PAULA ANN WOOD |
| 18 | August 5, 2009 | Transfer of $15,000 from LISA DELAINE DUTTON's SSLLC business account to the personal accounts of defendants JAMES CRAIG and LISA DELAINE DUTTON |
| 19 | August 25, 2009 | Transfer of $9,000 from LISA DELAINE DUTTON's SSLLC business account to the personal accounts of defendants JAMES CRAIG and LISA DELAINE DUTTON |
| 20 | October 16, 2009 | Transfer of $10,000 from LISA DELAINE DUTTON's SSLLC business account to the personal accounts of defendants JAMES CRAIG and LISA DELAINE DUTTON |
| 21 | November 16, 2009 | Transfer of $10,000 from LISA DELAINE DUTTON's SSLLC business account to the personal accounts of defendants JAMES CRAIG and LISA DELAINE DUTTON |
| 22 | February 2, 2010 | Transfer of $10,000 from LISA DELAINE DUTTON's SSLLC business account to the personal accounts of defendants JAMES CRAIG and LISA DELAINE DUTTON |

35.     Counts 13 through 22 constitute violations of Title 18, United States Code, Sections 2 and 1956(a)(1)(B)(i).

**FORFEITURE ALLEGATION**:

36.     Paragraphs 1 through 35 are reincorporated herein as though fully set forth for the purpose of alleging forfeitures to the United States of America, pursuant to the provisions of Title 18 United States Code, Section 982(a)(1) & (2).

37.     As a result of committing the offenses alleged in Counts 1 through 22 of this

13

indictment, involving the substantive offenses of mail fraud in violation of Title 18, United

States Code Section 1341; wire fraud in violation of Title 18, United States Code Section

1343; and, money-laundering in violation of Title 18, United States Code, Section

1956(a)(1)(B)(i), and conspiracy to commit those offenses, the defendants,

JOHN SULLIVAN RALPH III,
JAMES CRAIG DUTTON, and
WELCOME D. WOOD, JR., a.k.a. "BO" WOOD,
LISA DELAINE DUTTON,
PAULA ANN WOOD

shall forfeit to the United States all property, real and personal, which constitutes

proceeds of, is derived from or involved in the aforesaid offense and all property traceable

to such property, including, but not limited to:

A)      A monetary judgment of approximately $1,000,000.

38.      In the event any of the foregoing property: i) cannot be located upon the

exercise of due diligence; ii) is transferred, sold to, or deposited with, a third party; iii) is

placed beyond the jurisdiction of the Court; iv) is substantially diminished in value; or, v) is

commingled with other property which cannot be divided without difficulty, as a result of

any act or omission of any defendant, the Court shall order the forfeiture of any other

property of the defendants, up to the value of the property described in the foregoing

paragraphs.

A TRUE BILL.


June 4, 2014                                   s/ Foreperson
DATE                                              FOREPERSON OF THE GRAND JURY

14

s/Richard L. Hathaway, #07767
Assistant United States Attorney
for Barry R. Grissom
United States Attorney
District of Kansas
444 SE Quincy, Room 290
Topeka, KS      66683
Phone:    (785) 295-2850
Fax: (785) 295-2853
rich.hathaway@usdoj.gov

[It is requested that trial be held in Topeka, Kansas]

15

AO 245C   (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*     (NOTE:  Identify Changes with Asterisks (*))
Sheet 1

# United States District Court
## District of Kansas

UNITED STATES OF AMERICA

v.

John Sullivan Ralph III

**\*SECOND AMENDED
JUDGMENT IN A CRIMINAL CASE**

Case Number:  5:14CR40066 - 001
USM Number:  24538-031
Defendant's Attorney:  Robert G. Scott
                                           Brian H. Bieber

**Date of Original Judgment:     12/17/2015\***
(Or Date of Last Amended Judgment)

**Reason for Amendment:**

[ ]  Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
[ ]  Reduction of Sentence for Changed Circumstances (Fed. R.Crim.P.35(b))
[ ]  Correction of Sentence by Sentencing Court (Fed.R.Crim.P.35(a))
[*]  Correction of Sentence for Clerical Mistake (Fed.R.Crim.P.36)

[ ]  Modification of Supervision Conditions (18 U.S.C § 3563(c) or 3583(e))
[ ]  Modification of Imposed Term of Imprisonment for Extraordinary and
      Compelling Reasons (18 U.S.C. §3582(c)(1))
[ ]  Modification of Imposed Term of Imprisonment for Retroactive
      Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
[ ]  Direct Motion to District Court Pursuant to  [ ]  28 U.S.C. § 2255, or
                                                                         [ ]  18 U.S.C. § 3559(c)(7)
[ ]  *Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☒    *pleaded guilty to count(s):  1 of a 22-count Indictment.

☐    pleaded nolo contendere to count(s) ___ which was accepted by the court.

☐    was found guilty on count(s) ___ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371,<br>18 U.S.C. § 1343,<br>18 U.S.C. § 1956(a)(1)(B)(i) and<br>18 U.S.C. § 1001 | **Conspiracy to Commit Offenses Against the United States,** a Class B Felony | 12/30/2011 | 1 |

The defendant is sentenced as provided in pages 1 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐    The defendant has been found not guilty on count(s) ___.

☒    Counts 2-22, as they relate to this defendant, are dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the Court and United States Attorney of material changes in economic circumstances.

12/23/2015\*
Date of Imposition of Judgment

s/ Daniel D. Crabtree
Signature of Judge

Honorable Daniel D. Crabtree, U.S. District Judge
Name & Title of Judge

12/28/2015
Date

EXHIBIT
**4**

AO 245C     (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*<br>Sheet 2 – Imprisonment                                            (NOTE:  Identify Changes with Asterisks (*))

Judgment – Page **2** of **6**

DEFENDANT:     John Sullivan Ralph III
CASE NUMBER:   5:14CR40066 - 001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of <u>18 months</u>.

☒      The Court makes the following recommendations to the Bureau of Prisons:

If eligible, the Court recommends designation as close to the defendant's home as possible, to facilitate continued contact with family members.

☐      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district.

        ☐ at ___ on ___.

        ☐ as notified by the United States Marshal.

☒      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

        ☐ before ___ on ___.

        ☒ as notified by the United States Marshal.

        ☐ as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
                       UNITED STATES MARSHAL

By _____
                    Deputy U.S.  Marshal

AO 245C    (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*
         Sheet 3 – Supervised Release                                                (NOTE:  Identify Changes with Asterisks (*))

Judgment – Page **3** of **6**

DEFENDANT:      John Sullivan Ralph III
CASE NUMBER:   5:14CR40066 - 001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>two (2) years</u>.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court.

☒    The above drug testing condition is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.  *(Check if applicable)*

☒    The defendant is prohibited from possessing or purchasing a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check if applicable)*

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check if applicable)*

☐    The defendant shall register as a sex offender, and keep the registration current, in each jurisdiction where the defendant resides, where the defendant is an employee, and where the defendant is a student.  For initial registration purposes only, the defendant shall also register in the jurisdiction in which convicted, if such jurisdiction is different from the jurisdiction of residence.  Registration shall occur not later than 3 business days after being sentenced, if the defendant is not sentenced to a term of imprisonment.  The defendant shall, not later than 3 business days after each change in name, residence, employment, or student status, appear in person in at least one jurisdiction in which the defendant is registered and inform that jurisdiction of all changes in the information required.  *(Check if applicable)*

☐    The defendant shall participate in an approved program for domestic violence. *(Check if applicable)*

If this judgment imposes a fine or restitution, it is to be a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this Court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without permission of the court or probation officer;
2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or the probation officer;
3)   the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)   the defendant shall support his or her dependents and meet other family responsibilities;
5)   the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substances or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245C      (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*                    (NOTE:  Identify Changes with Asterisks (*))
             Sheet 3C - Supervised Release

Judgment – Page **4** of **6**

DEFENDANT:      John Sullivan Ralph III
CASE NUMBER:    5:14CR40066 - 001

# SPECIAL CONDITIONS OF SUPERVISION

1.      The defendant shall not incur new credit charges or open, or attempt to open, additional lines of credit, without the prior approval of the probation officer. The defendant shall also execute any release of information forms necessary for the probation officer to monitor the defendant's compliance with the credit restrictions.

2.      The defendant shall immediately provide the probation officer with access to any and all requested financial information, to include executing any release of information forms necessary for the probation office to obtain and/or verify said financial information.

AO 245C    (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*    (NOTE:  Identify Changes with Asterisks (*))
Sheet 5 – Criminal Monetary Penalties

Judgment – Page **5** of **6**

DEFENDANT:        John Sullivan Ralph III
CASE NUMBER:   5:14CR40066 - 001

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the total criminal monetary penalties under the Schedule of Payments set forth in this Judgment.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $100 | None. | $883,098.23 |

☐    The determination of restitution is deferred for up to 90 days. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒    The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Glock, Inc. | $883,098.23 | $883,098.23 | |
| Totals: | $883,098.23 | $883,098.23 | |

☐    Restitution amount ordered pursuant to plea agreement $ ___ .

☒    *The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options set forth in this Judgment may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐    *The Court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ *the interest requirement is waived for the ☐ fine and/or ☐ restitution.

☐ the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C    (Rev. 09/11 - D/KS 08/12) Second Amended Judgment in a Criminal Case*                      (NOTE:  Identify Changes with Asterisks (*))
        Sheet 6 – Schedule of Payments

Judgment – Page **6** of **6**

DEFENDANT:     John Sullivan Ralph III
CASE NUMBER:   5:14CR40066 - 001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   ☐   Lump sum payment of $____ due immediately, balance due
           ☐ not later than ____, or
           ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B   ☒   Payment to begin immediately (may be combined with ☐ C, ☒ D, or ☒ F below); or

C   ☐   Payment in monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ____ years to commence ____ days after the date of this judgment; or

D   ☒   Payment of not less than 10% of the funds deposited each month into the inmate's trust fund account and monthly installments of not less than 5% of the defendant's monthly gross household income over a period of two (2) years, to commence 30 days after release from imprisonment to a term of supervision;  or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☒   Special instructions regarding the payment of criminal monetary penalties:

If restitution is ordered, the Clerk, U.S. District Court, may hold and accumulate restitution payments, without distribution, until the amount accumulated is such that the minimum distribution to any restitution victim will not be less than $25.

Defendants shall direct payments on this restitution obligation to the Clerk of the United States District Court for the District of Kansas, United States District Court, U.S. Courthouse - Room 204, 401 N. Market, Wichita, Kansas  67202.

Unless the Court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☒    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount Joint and Several Amount and corresponding payee, if appropriate.

| Case Number (Including Defendant Number) | Defendant Name | Joint and Several Amount |
|---|---|---|
| 5:14CR40066-002 | James Craig Dutton | $542,794.73 |
| 5:14CR40066-003 | Lisa Delaine Dutton | $542,794.73 |
| 5:14CR40066-004 | Welcome D. Wood, Jr. | $483,103.00 |
| 5:14CR40066-005 | Paula Ann Wood | $483,103.00 |

☐    The defendant shall pay the cost of prosecution.
☐    The defendant shall pay the following court cost(s):

☒    *The defendant shall forfeit the defendant's interest in the following property to the United States.  Payments against any money judgment ordered as part of a forfeiture order should be made payable to the United States of America, c/o United States Attorney, Attn: Asset Forfeiture Unit, 1200 Epic Center, 301 N. Main, Wichita, Kansas 67202.
*A money judgment in the amount of $883,098.23 is ordered. The United States shall devote any amounts recovered on any of these forfeiture judgments, first, to pay the restitution award recited in this order.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.